Good morning, Your Honors. May it please the Court, my name is Keith Jacobi, and Elizabeth Wynne and myself have the privilege of representing PM Realty Group in this special CAFA appeal. And the focus of this appeal is quite narrow. It's about the meaning of three words, amounting controversy, which is contained in CAFA's removal statute, 28 U.S.C. 1332D. And unlike the court in Ybarra, which laid out the standards for CAFA removals just a year ago, this court has the benefit of layers and layers and layers of evidence that more than $5 million is in controversy. What does what is in controversy mean? What is in controversy is what is at stake. It's what's being litigated. And this court knows what's being litigated for many, many reasons. It's in the complaint. Years and years of liability is being tested for the entire class of California non-exempt employees who are employed by PM Realty. What's at stake? How many work weeks are at stake? How many meal and rest periods will be tested is in the record. The declaration of failure. You make a couple of arguments in this case. One is relying only on the language of the It can't be that at all relevant times, then that broadens the class to this huge number. I think your better argument is the reliance on the affidavits that were supported in connection with the motion for class certification. Well, let me address that, Your Honor. In the, as I said, in Ybarra, that case was remanded by the Ninth Circuit for an evidentiary showing of what was at stake. The plaintiffs in this case, class counsel, has shown his hand. He testified at deposition that he was rarely, if ever, given a rest period. He testified at deposition that he generally was not given a meal period. At class certification, he submitted declarations from three class members who said they never got rest periods. And most importantly, in discovery, he asked for all of the time cards of all of the class members for every pay period, for every work week. So I would note that what some district courts, including this district court, relied on is the violation rate. The word violation rate is nowhere in 1332d. It's nowhere at all. Well, that's what you presented to the district court. Well, we You said, well, let's estimate here, or we'll take a look at their allegations and the complaint, your HR person's affidavit that was submitted, both in the removal petition and in the support of class certification. And you said you offered two theories. One, every instance, as Judge Wynn suggested. And another one, well, we'll just take two violations per week per class member. Yes, we did offer Correct? We did offer two alternative theories. Let's take the two, which I guess you characterized as the conservative estimate, correct? The fewer, the smaller amount is the conservative estimate. Right. There's no question in this case. So on what do you base those assumptions of two violations per class? Where did that come from? Well, what we did is we looked at the complaint and the complaint said that Often But it said that systematically PM Realty denied people rest breaks Well, it said they had policies. Yes. They never really spell out what those, I still can't figure out what those policies are. Well, if this case was attacked on remand at the plea right after removal, we might have this problem, which is what I think the court faced in Ybarra, that you're not quite sure what that means. It hasn't been given statistical life by the plaintiff and by other class members. But that's not a concern here because the plaintiff testified under oath. I miss four rest periods a week. I miss three meal periods a week. So Judge Real said, well, you can't apply that to every class. It's not, there's not a proper basis to apply that to every class member because he pointed out two things, as I understand what he did. One, the potential class members here encompass both the field workers, technicians and engineers, and on-site administrative staff. Yes, the overwhelming. And it was sort of acknowledged, although I don't believe there was any stipulation to the effect, to this effect, that the administrative types were really not part of the class if you look at the class definition. Because what the class definition talks about was the way in which they arranged for the taking of a break. They didn't provide enough backup. And that doesn't fit with the administrative staff. Well, that is, it is true that the administrative staff is different from the field staff. Right. But, again, we don't have to guess about what's in controversy because at class certification, at the very end of this story, Mr. Mahoney did not seek to limit the class to exclude the administrative personnel. His motion for class certification seeks to include. Well, but that's because he has a number of claims that would impossibly encompass them. Well, I think, but nevertheless. He could have moved for subclasses. He could have, nevertheless. But he didn't. And I don't know why not. I mean, but it's pretty clear that his claims possibly could encompass because he has this claim about they didn't keep adequate records. That would encompass everybody. What the Court does know is that if Judge Reel would have granted the motion for certification, my client would be required to defend every claim. He didn't seek to certify some claims. That's just guesswork. He sought to certify every claim with respect to every non-exempt employee. And that's why I believe amounting controversy simply can't mean. But Judge Reel focused. We're only here because Judge Reel limited his analysis to the meal and rest breaks. And he said those don't count and the others aren't enough, so back you go to State court. Well, let's focus on what Judge Reel did because I'd like to read the critical portion of Judge Reel's order where he says, While it is true that Mr. Branches claims that he and the putative class members were often forced to forego a meal period and or work during their meal period, this does not mean that such violations occurred in each and every shift of each and every class member. It says nothing of the frequency that PMRG would deprive class members of their entitled meal or rest periods. What he's basically doing is he's asking us to either confess liability, which the Ninth Circuit cases say we do not have to do, or to be fortune tellers and say, even though there are strict limits prior to class certification on the kind of discovery you can do with respect to absent class members, and that is why the only evidence of absent class members comes from the plaintiff who voluntarily produced it, that if you can tell us what the violation rate is for absent class members, you can't stay in the Federal court. I think that is not the way class certification discovery is structured. It's certainly not what CAFA requires, and I frankly think that it is a misuse of the amount in controversy standard. Well, let's assume, Mr. Chikowit, that that portion of the Court's analysis was off, that that was a misanalysis. There is an assumption in your conservative calculation to include, as Judge Pius pointed out, office workers. So to what extent does the stipulation in the record that office workers are situated differently matter in terms of the analysis? Well, the office workers, I believe the reason why plaintiff included the office workers in the putative class and in the proposed certified class is because they're subject to the same meal and rest policy rules as the people in the field. They may not be subject to the same field conditions. There's no evidence that those office workers were not relieved of their duty. In fact, they were relieved of their duty. The office workers, for the most part, are now working at the company who succeeded PMRG, that's CBRE, who's doing this work now, which is essentially servicing Chase Banks. I think what Ybarra sets the test out very clearly, as does follow on cases like Ray, we're not allowed to pull numbers out of thin air. And so think about what that means. Let's look at overtime, which is an easier example. You earn overtime after 40 hours a week. Potentially you can work up to 169 hours a week. But what you're not allowed to do is you're not allowed to say, well, we need 30 hours of overtime to get us over 5 million, so we assert 30. That's just pulling numbers out of thin air. Nowhere in this record, from the day we removed the case to today, have we pulled numbers out of thin air. The numbers that we were relying on are all uncontroverted. Fowler-Knight's declaration. But they do have to be reasonable numbers. So how can you come up with a reasonable number here on the wage rate to use as a multiplier? Okay. Judge Reel did take issue with the wage rate. What we did was we took the wage rate of the field workers, which is around $25. There is a range. And we averaged it and multiplied that across the class. I think to do an algorithm of taking each individual's wage rate and multiplying it against each penalty provision, $100 in 226, the 30 days pay in 203, I believe is a level of precision that is not required, particularly here where when you look at our two models, we're not close to 5 million. Mr. Kobe, I may or may not agree with you on that, but that doesn't justify the reasonableness of using the average. I mean, the average is very imprecise to me. As a matter of law in California, the waiting time penalty rate is paid at the last rate of pay. And typically workers make more money as they progress through the year. So the average rate is probably an underestimate. There is no evidence in the record, and we produced an awful lot of records in this case, that the $25 does not reasonably approximate what most of the workers were working. It was within, I believe, a dollar of what the plaintiff, Mr. Branch, was working. So once again, the plaintiffs are trying to use, play this shell game and say ---- of the people who were on location and the average wage rate of the people who were out in the field. You could do that. Well, is there a substantial difference in pay if you're out there not eating lunches, not taking breaks, versus sitting in a nice, cushy office? Well, what the record shows is that Mr. Branch was a field worker. He earned, I believe, and I can check it while Mr. Mahoney is arguing, $23 or $24 an hour, which is very, very close to the average. All right. Do we have any idea what the average of the people on site? We've never done that number. Certainly, if that was the concern, again, you wouldn't look to the average to determine the $226 or $203 penalty. You'd look to their last highest rate of pay. And so I believe that, too, is conservative. So are you saying the average relates only to the meals and breaks? I believe what you would do, if you were actually multiplying this out, would be you'd look at their rate at the time that the penalty was missed. And that should be, for someone who worked the entirety of the class period, that's likely to approximate the average. They certainly haven't presented any evidence to the contrary. The only reason why you use that is because that's the substitute for missing a break. You get an extra hour. Yes. And, again, what we did was we averaged all of the employees' wage rates together. So it's not like we did an account for the few workers who earned $10 an hour. They dropped down the average. Let me ask you. The figure 184, is that only field people or is that the combination of the field and on site? It's a combination of the two, but it's mostly field people. Mostly what? It's mostly field people. Field people. And, again, the on site people were subject to the Warren Act claim that they were separated as well. I haven't been able to interview them because they. But you would agree, wouldn't you, that it's highly unlikely for people who are on site that they're constantly getting calls while they were taking a break, more often than not. I think that would be the kind of speculation that is not required. And I'd like to reserve my two minutes at this point. That's fine, that's fine. Good morning, Your Honor. My name is Kevin Mahoney and I'm representing the plaintiff in this matter. May it please the court. First, I'd just like to address one issue that Mr. Jacoby raised. And that's the issue of whether or not the office workers were part of this class. At Mr. Branch's deposition, the party stipulated to remove the office workers. So that. Did they actually say I stipulate that or that I agree they're a little different? Plaintiff and defense counsel, we stipulated that the similarity between the field workers and the office workers were so dissimilar that it made no sense to include them in the class. So for purposes of not only. This is in a deposition? Yes, Your Honor. And is deposition part of the record? It is, Your Honor. And so for purposes of the. This is the Branch deposition? Correct, Your Honor. For purposes of the calculations, and this is why it's very important. At the stage of removal, defendants utilized a number of 184 employees and came up with their spreadsheet in terms of damages. At the deposition, the party stipulate to remove the office workers. Defendants still used. Do you have that record excerpt right in front of you that you can read to us what the terms and conditions of the stipulation are? Your Honor, I do not have the excerpt of that, but that was a stipulation. I don't think counsel would disagree. For purposes of class certification, the party said that the office workers were not going to be part of the motion of class certification. At the removal, defendants utilized a number of 184 class members, which consumed the entirety of their employees. After the stipulation, defendants still utilized 184 employees for purposes of their damage calculation with their petition to appeal. Can I get back to the deposition for a moment? Because I have that record, and if I'm looking at the right page, it's Mr. Mahoney says, and I think for purposes of this case, we would even stipulate that the people in the office at Torrance probably is different from those outside. Is that the stipulation you're referring to? Correct, Your Honor. So in your briefing for class certification, the way you defined the classes, was it inconsistent or consistent with the stipulation? Your Honor, I believe it was consistent because the parties had already agreed that the certification motion would not include the office workers. So when we filed our motion, the understanding was it was only with respect to these field workers. Your understanding was you carved them out. You didn't carve them out. You didn't say except office workers. Correct, Your Honor. In the motion itself, it didn't say except. However, once again, the parties did stipulate to it. So while it didn't carve out specifically in the motion itself, the understanding between the parties was exactly that, that these people would not be included. So let's say that we agree that an estimate of two meals and two rest break violations per week per worker was reasonably supported by the record. Will we still have to remand for further factual findings by the district court to sort these issues out? Because if you carve out the office workers, and I think there are route technicians, engineers who have company cars based on your unpaid driving time claims, those seem to me to be factual issues that are more appropriately sorted out at the district court level to see whether if you exclude certain people, the amount then falls below the CAFA threshold. Or whether you have to also look at the other claims that Judge Rill didn't really look at. Well, Your Honor, I don't believe we need to go back for factual determinations. Number one, even within the appellant's motion, they now bring forth new numbers, and they call them post-removal numbers. The reality is these numbers are based on nothing but pure speculation. How do you now come up with more damages when you have this? There's no more evidence introduced to show that, well, we did this analysis, and therefore, it's just here's some more numbers, and it's even higher now. Well, that's why I'm asking these questions, because the Court of Appeals is not an appropriate place to sort out these little factual issues. What are the numbers? What are the wages? Don't we just have to decide whether the two meal, two rest break per week violation was adequately supported? Whether that was reasonable based on the evidence presented in the record? Correct, Your Honor, and I think Judge Rill had it correct. And as the dark court said, the district court, the parties put forth the evidence, and the district court makes the determination on where the presumption lies. Judge Rill looked at the evidence. He cited the plaintiff's testimony and said exactly what this court has already said. You cannot simply look at Mr. Branch's testimony and now say that every class member suffered the same violation rate. But there were not only Mr. Branch's testimony or affidavit or whatever it was. There were the affidavits of the other three. Correct, Your Honor, which showed lower rates of violations. So that's even more problematic for defendants' calculations. Well, they all seem to say, if I'm not mistaken, that at least with respect to their rest break, that they rarely, if ever, got a rest break. Is that right? Well, Your Honor, I don't believe they said they rarely, if ever. They said they would miss them on certain occasions. So maybe two. Wait a minute. Wait a minute. They said rarely, and I think all three of them said rarely. With respect to rest breaks. Okay. And then for meal breaks, they would frequently take calls during meal breaks and rarely, if ever, get rest breaks. And these violations are stemming out of policies in handbook that are applied uniformly and consistently. So if you take all that together, two violations, meals, and rest per week doesn't seem unreasonable. Your Honor, I'll just say this. Even if we take these violation rates, the numbers are flawed. Counsel said that Mr. Branch testified to making $25 an hour. Mr. Branch testified that he started at $17 an hour, and at the end of his employment, he was at $17.69 an hour. Their numbers are inflated. If we take their numbers as is upon removal at $5 million, 5 plus million, all we have to do is a mathematical calculation there. You take 17, but they relied on 25. Take a third off because they've inflated the numbers. Mr. Branch testified not only did he make $17 upon starting, that he ended at $17.69, and to his knowledge, field technicians all were paid starting at $17. Ms. Mahoney, how do we deal with all that when the district court made no findings to help us on that? And the district court's factual determinations are limited to the meals and rest breaks issues, and very generally with respect to the wage rate to be applied. How can we possibly deal with that when there's no factual findings beyond those? I think this court said it earlier. Judge Real specifically stated that your numbers are flawed on these two issues. Therefore, you do not meet the requirement. If their numbers were flawed on their meal and rest break claims and they could not reach the COFA requirement, there's no need for the district court to continue in the analysis. And so that's really the crux of this case. Defendants have chosen arbitrary numbers not based in any reality. For instance, they cite the case of Rhea. The difference with Rhea in this case, in Rhea, not only did they have the vice president of human resources submit a declaration attesting to office managers, I'm sorry, store managers were required and expected to work 45 hours a week and did. They then went to the actual store managers and got testimony and declarations saying they did work these hours. Defendants have put forth no evidence from any field technician saying, yes, I often did this. I worked this many days. I worked this much overtime. There's nothing in the record by defendants. What they've submitted is a declaration from an HR person who says there's almost 20,000 work weeks. And then they use this inflated average hourly rate. The courts looked at all this, and the court made a determination that you didn't hit the COFA number because these two things were flawed. DART says that, you know, the district court gets to make that determination. There's no need to go back to do a factional analysis because I would presume it'd be the same thing. The court will go on to say, well, with the other claims, you did a 100% violation rate. You cannot do that. This court has said you cannot just unilaterally assume a 100% violation rate. Defendants are required to put forth summary judgment type evidence. Did the district court in any way refer to some of this testimony from the declarations such as, we rarely had uninterrupted meal breaks. We rarely, that was Barsamian. And then the other, all three of them said they rarely got their rest breaks. Did the district court refer to any of that in its determinations? I would say the district court did not specifically refer to it, but I do not believe that the district court did not pay attention to it. And the reason why I believe it's evident that the court looked at it was because specifically the court said, you cannot simply use Mr. Branch's testimony and apply it to the class members unilaterally. Well, does that mean, are you suggesting then a class action in which the purpose for the class is to be able to act more efficiently collectively? Are you saying that a deposition would have to be taken of each class member to establish this? No, I'm not, Your Honor. Okay, okay, okay. Three is not enough. And let's assume for purposes of argument the class is 184. Three is not enough. How much is enough to make a reasonable conclusion that they probably rarely got their required rest break? How many would it take? Your Honor, I don't have a specific number as to how many it would take, but I would say this. Defendants are in control of all of this information, sort of like the court questioned counsel earlier. Well, how did you come to this average? Did you take the average of the office workers versus the field workers? No, we didn't, Your Honor. But this is the type of information that is not in their hands. It's in your hands because this is testimonial type evidence and they're your clients. They're the ones who can testify. There's no document that can establish that rarely, if ever, did they get a rest break, is there? Well, that's not necessarily correct, Your Honor. What document is it that would establish that? In other cases I've done, you have meal period violation records where if I missed a meal period, we sign something and submit it to the employer. Is there any such document that shows up anywhere in the record in this case? I would say no, Your Honor, and this is why it's even more important, as I was saying. Defendants have every record we need, which would be, for instance, let's just take the pay rate. I mean, this is really the basis for the damages. What is the average hourly rate? If they can't get that right, then how do we trust anything that stems from it? The court just asked, well, how did you get to this rate? Well, you know, Your Honor. Let me tell you the problem I'm having. You and I are having more discussion about the facts, it seems like, than the district court had. Well, Your Honor, I would disagree to the extent that I believe the court looked at the testimony. I mean, the deposition was submitted, the declarations were submitted, and the court found that defendants didn't meet their burden. And it really goes back to the fact that defendants are required to put forth summary judgment type evidence. SALCEDO stands for the basis that you have to make reasonable assumptions. And you can't just simply say, well, you know what, we're just going to assume that. Let me ask you one question about the policy. I don't know if it was in your motion for class certification or if it was in the opposition or in support of your motion to remand, but you made reference to policies of the defendant that allowed this to happen, the claims that you raised. Yes, Your Honor. What was that in reference to? So, Your Honor, for instance, with respect to the drive time claim, defendants did not have a policy of paying for drive time. So the failure to even – So that policy would apply to everybody who had a – who was driving their company vehicle. And that would apply only to the field technicians. It wouldn't apply to the office workers. But let's take that, Your Honor. Defendants unilaterally used a – let's call it a 100 percent violation rate every day for the drive time. Mr. Branch testified that there were days that he would go home early. So you can – so, once again, defendants unilaterally decided we're going to set up an arbitrary average hourly rate and we're just going to, across the board, say this happened to everybody at the same rate. So I understand what's supposed to happen here. So they look at the theory of your case or the claims that you're raising and say, you know, it sure looks like they're seeking damages over 5 million. So we have to put forward some evidence. Your Honor, I think what defendants – And as Judge Murphy said, you can't expect them to depose every class member. I don't disagree, but this Court has said a removing defendant cannot assume a 100 percent violation rate. Right. Where the plaintiff alleged the defendant had a pattern and practice of committing wage and hour violations. This is Ibarra. Yes, this is Ibarra. I think that's why we're talking about the more conservative numbers rather than the – I think it was 11 million if you take the complaint and apply it across the board. But even if we did that and talk about the more conservative number, Your Honor, that was only with respect to meal and rest break. I mean, let's take the other violations or the other claims. Once again, it assumes that everybody who was laid off under the Warnack Theory was entitled to 60 days wages. Now, as defendant counsel just stated, some of these individuals went to work for the predecessors. The company that picked up the contract. Yes, correct. Now, their argument in their opposition to Class Cert is we don't owe these people anything because they were offered jobs. So, on one hand, you say, well, we don't owe them anything because they were offered jobs, but you use 60 days as the amount in controversy for that claim. I thought the conservative numbers applied to all the claims except for the Warn Act. No, Your Honor. I believe the conservative numbers specifically addresses the meal and rest breaks, wherein in their chart they specifically state we've used a conservative number. Let's see. Yes, I'm sorry. So, they used a conservative number and they only applied two to five violations per week. Number one, let's just look at their own chart. We apply two to five violations per week. What is that based on? I don't know if it's two. I don't know if it's five. I don't know if it's three. I don't know if it's four. Well, they give you a range in the dollar. If it's two, it's $900,000. If it's five, it's $2,000,002. Correct. So, I'm not baffled by that. So, if we take it on the low end, $900,000 for each, once again, I just showed that the problem with the Warn Act claim is that people left the employment to take another job, so not everybody fits the 60 days of wages. So, the $1,089,000 cannot be factually based on anything other than we took 84 people because we have records for them. We use a violation rate of $25, and we multiply that out by 60 days. I mean, this is the problem. Like, they are required to do some sort of analysis. They have these records. They have the records of who left, why they left, when they left, and instead, once again, we use, you know, arbitrary numbers. All right. We let you go over time. Thank you, Your Honor. Thank you very much. Interesting. Okay, you have a couple of minutes for a rebuttal. Thank you, Your Honor. This last Warn Act exchange shows the folly of plaintiff's approach. I'll look in the camera so my client can see it on YouTube. We assert they are owed nothing. We assert that their Warn Act claim should be granted summary judgment in our favor. That does not mean that nothing is in controversy. That is the nonsense that is engaged in when you look at who's going to win. That does not determine what is at stake. Before you go on, did you stipulate that the site employees versus the field employees were not part of the class, and therefore the class is less than 184? We did not stipulate to that. What we stipulated to is that there is a difference between the two, and he read the record in its entirety, and all this court needs to do is go to his class certification motion where he says, I'm seeking to certify a class of all 184 employees. So despite the acknowledgment, which I'll continue to make here, that there may be differing circumstances for the administrative workers, they're not going to interface with the policy in the same way, knowing that, taking my client Fowler Knight's deposition for five-plus hours, he sought to certify all of them. And I will close on one thing that Mr. Mahoney certainly cannot do. He cannot shrink the size of this class to get the case remanded to state court. What is in controversy is judged at removability. He can throw out all of the administrative workers. He can throw out everybody but ten people, and it wouldn't make this case any less of a federal case. It's judged at removability. At the time of removal, there were 184 people in this class, uncontroversial. At the time of removal, he sought 60 days' pay under the WARN Act. Uncontroverted. At the time of removal, he said that people in his pleading were rarely given rest breaks, were not given their meal breaks, were not paid overtime. Uncontroverted. There is no basis. The Senate Judiciary Committee, when they put this statute together, said it was in response to the shell game that plaintiffs' lawyers were playing to try to defeat jurisdiction. But our most conservative estimates are the same. The Supreme Court said you just can't come in and say, you know, it's $5 million. Well, that's exactly right. And that's why if you run the numbers. So under our case law, and under what the Supreme Court said, you've got to come up with some evidence on which to base those assumptions. And all of the evidence, whether it's from Ms. Knight, Mr. Branch, or the three declarations we've submitted, all of it preponderates in favor of a model that is worth more than $5 million. He hasn't proposed a model where he has said it's really $3.5 million, it's really $2.5 million, and as Judge Murphy indicated — So let me just ask you this. So Judge Rill said, well, it's — your showing is insufficient, meaning you didn't produce — you didn't present a — by a preponderance of the evidence, you didn't meet your burden. And he seemed — that seems to be a factual determination. Isn't that determination entitled to — unless it's clearly erroneous, we're obligated to defer to him? Well, his factual determination is really tied to a legal — a legal finding that we need to present liability as to each and every class member. No, wait a minute. No, he found that you didn't meet your burden. So was that a — was he making a factual determination? Well, I — I would agree with the Court that factual determinations are viewed for clearly erroneousness, but the ultimate finding of jurisdiction is a legal determination that is reviewed de novo. Well, we have to say that his determination is clearly erroneous on this record, and therefore that the amount in controversy was $5 million, over $5 million. I don't think one syllable has been uttered during this oral argument or anywhere on the record that suggests that less is in controversy. When we're talking about what is rarely given a break mean, there's no evidence here of someone who said, I was always given my breaks. There's no evidence in here that someone said, I usually had my meals. And as Judge Murphy pointed out, that evidence is in the province of the plaintiff. Ms. — I'm sure Judge Reel would like evidence from all 184 class members, but under the Federal Rules of Civil Procedure, I only get to take 10 depositions, so that's not possible, and I can't talk to his clients. So this is — this is putting the bar in a place that you simply won't be able to remove cases, and that's what the Senate decided. Well, I mean, you know, in La Crosse and in Wray, clearly those were cases where the removing party was able, without much difficulty, to meet their burden. I think at a — at a bare minimum under UBARA, there should be a remand for further factual findings, at the barest of minimums. But I think given that all of the models — all of the models preponderate in favor of a $5 million or greater standard, and I appreciate the Court's time this morning. Thank you. Okay. Thank you very much, counsel. We appreciate — we appreciate your arguments in this case. Very interesting. And we'll submit it at this time.
judges: Murphy, Paez, Nguyen